1
2
3
4                            UNITED STATES DISTRICT COURT
5                          NORTHERN DISTRICT OF CALIFORNIA
6
7   KATHLEEN STALLWORTH,                     Case No.  11-cv-04841-WHO
                 Plaintiff,
8
         v.                                  **ORDER DENYING MOTION FOR**
9                                            **WRIT OF ADMINISTRATIVE**
    COUNTY OF SANTA CLARA, et al.,           **MANDAMUS**
10
                 Defendants.                 Re: Dkt. Nos. 50, , 54,
11
12
13          This case challenges plaintiff's temporary suspension, and then demotion and transfer,

14   from her job as an emergency department (ED) nurse at the Santa Clara Valley Medical Center

15   (SCVMC).   Plaintiff's Amended Complaint alleges various causes of action under California law,

16   including anti-retaliation and whistleblower claims, violation of 42 U.S.C. § 1983 and a claim

17   seeking a writ of administrative mandamus under California's Code of Civil Procedure.[1]  Pursuant

18   to the parties' stipulation, the Court bifurcated the Ninth Cause of Action for administrative

19   mandamus asserted against the County of Santa Clara Personnel Board ("Board").  Currently

20   before the Court is plaintiff's motion for a writ of administrative mandamus and defendants'

21   opposition thereto.  That matter was set for hearing on September 25, 2013 and pursuant to Civil

22   Local Rule 7-1(b), finding the matter appropriate for resolution without oral argument, the Court

23   vacated the hearing.

24
25
26   _____
     [1]  Plaintiff alleges: invasion of privacy; intentional infliction of emotional distress; violation of
27   Cal. Labor Code § 1102; violation of California's Fair Employment and Housing Act (FEHA,
     Govt. Code § 12940); violation of Cal. Govt. Code § 6310(b); violation of Cal. Govt. Code §
28   1278; violation of Cal. Civ. Code § 52; violation of 42 U.S.C. § 1983; and a claim for writ of
     administrative mandamus under Cal. Code of Civ. Proc. § 1094.5 and § 1086.

United States District Court
Northern District of California

United States District Court
Northern District of California

# BACKGROUND

Plaintiff worked in the ED of SCVMC for 22 years.  Between June 2005 and March 2009, plaintiff was counseled 13 times for violations of rules, policies and procedures.  Administrative Record (AR) 277-29.  In a May 27, 2009, letter Nurse Manager Andrea Brollini recommended that plaintiff be suspended for one week based on eleven alleged violations occurring between March and May of 2009.  AR 252-62.  Plaintiff requested a *Skelly* hearing. [2]  A hearing was held on June 30, 2009, and the *Skelly* hearing officer (Nurse Ann LaBorde) sustained the disciplinary action and imposed a one week suspension on plaintiff.  AR 12-23.  Nurse LaBorde found that plaintiff had committed the eleven violations, and concluded that plaintiff had "a recent increase in the number of errors in your practice, but there is evidence in the letter that failure to follow policy and failure to maintain timeliness, accuracy and safety in your practice of patient care delivery has been a documented issue since 2005.  Yet, you continue to repeat some of the same mistakes."  AR 22.

On March 25, 2010, Acting Nurse Manager Michelle de la Calle recommended that plaintiff be terminated based on nine additional incidents occurring between November 28, 2009 and January 8, 2010.  AR 640-654.  Plaintiff again requested a *Skelly* hearing, and on August 9, 2010, the *Skelly* officer (Interim Director of Care Management Dionette Kelton), sustained six out of the nine alleged incidents and concluded that instead of termination plaintiff should be demoted and transferred to another unit.  AR 267-294.  Nurse Kelton concluded that plaintiff had "failed to exercise the degree of learning, skill, care and experience ordinarily possessed and demonstrated by a nurse who has worked in the Emergency Department for the past 22 years.  Your reluctance to accept responsibility for your errors as demonstrated in several conversations both during the investigational interviews, *Skelly* hearing and submission of *Skelly* hearing summary of charges [] are of particular concern."  AR 291.  In order to avoid jeopardizing patient safety, Nurse Kelton decided to demote plaintiff to a Clinical Nurse II position (from Clinical Nurse III in the ED) and move plaintiff to a medical/surgical unit that is more structured and where patients present more predictable outcomes.  AR 292.

---

[2]  *See Skelly v. State Personnel Board*, 15 Cal. 3d 194 (1975).

Plaintiff argues that the incidents which led to plaintiff's discipline must be understood in context; that context being that plaintiff was targeted by Nurse Brollini and others in retaliation for plaintiff speaking out about patient care and criticizing Nurse Brollini's management of the ED, particularly with respect to acuity ratios.  AR 1371-1372.  Plaintiff also claims she was retaliated against for reporting, first to Nurse Brollini on March 11th and then to Brollini's supervisor on March 23, 2009, the use of an allegedly illegal external jugular IV.  AR 1814-1820.  Due to this retaliation, plaintiff alleges that other nurses were told not to help her (*see e.g.*, AR 877) and plaintiff was assigned too many patients and patients with high acuity (AR 1593-94), which led to some of the violations.

The Board upheld the suspension on a 5-0 vote; upheld the transfer on a 5-0 vote; and upheld the demotion on a 4-1 vote.  AR 1975.  The dissenting vote on the demotion expressed his concern that the mistakes made warranted transfer but not demotion and there were "mitigating" circumstances based on plaintiff's testimony that she was being "picked on."  AR 1976-77.  The dissenting vote also noted that there were management issues in the ED, with "people being picked on" and "nurses not helping" that needed to be "worked on" independent of whether plaintiff remained in that unit.  *Id.*, at 1977.

## LEGAL STANDARD

Under California Code of Civil Procedure section 1094.5, the Board's determination is reviewed for "prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  That analysis requires this Court to exercise its "independent judgment" to determine whether the findings of the body below – here the Personnel Board – are supported by the "weight of the evidence."  *Strumsky v. San Diego County Employees Ret. Ass'n*, 11 Cal. 3d 28, 31 (1974).  "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."  *Fukuda v. City of Angels*, 20 Cal. 4th 805, 817 (1999).  The Court must also, in the exercise of its independent

judgment, "reweigh the evidence by examining the credibility of witnesses." *Barber v. Long Beach Civil Service Com.*, 45 Cal. App. 4th 652, 658 (Cal. App. 1996).

## DISCUSSION

### I.  SUSPENSION

#### A.     Patient 4919

SCVMC policy requires nurses to accurately document administration of medicine in the medical record.  AR 26.  On March 2, 2009, plaintiff withdrew and administered Tylenol to a patient but charted it as aspirin.  AR 20, 1026.  Plaintiff claims that this error was discovered only because plaintiff's medication administrations were audited by Nurse Brollini, as part of her campaign of retaliation against plaintiff.  Nurse Brollini admitted that this was the first time she had conducted such an audit on plaintiff.  AR 1101-1102.

There is no evidence, however, that plaintiff was unfairly targeted for the audit.  Nurse Brollini testified that she conducted the audit because co-workers had expressed concerns about plaintiff's nursing practice.  AR 1102.  There is evidence in the record that co-workers had concerns about plaintiff's nursing practice in the past, concurrent with and prior to plaintiff's complaint about the use of the illegal external jugular IV.  *See* AR 18.  Moreover, plaintiff points to no evidence in the Administrative Record that performing a medication administration audit was unusual or atypical in response to concerns about patient care.  Nor is there evidence in the record that errors in charting medication are not considered serious errors by SCMVC, or that SCVMC has not used this sort of error as a basis for disciplining other nurses.

In sum, the weight of the evidence supports a finding that plaintiff violated SCVMC policy as to Patient 4919.

#### B.     Patient 2947

SCVMC policy requires that nurses use the "Fenwal Blood Identification" process to label all blood drawn and sent to the laboratory for blood-type matching.  AR 65.  Pink-capped tubes are used, with one rare exception, solely for Fenwal blood identification.  AR 1275.  On March 26, 2009, plaintiff withdrew blood from a patient in a pink-capped tube but failed to properly label it

United States District Court
Northern District of California

United States District Court
Northern District of California

1     with a Fenwal label.

2         At the departmental hearing, plaintiff claimed that the failure to properly label was "human

3     error."  AR 255.  At the *Skelly* hearing (according to Nurse LaBorde) plaintiff testified that the

4     blood vial was not mislabeled because it was "not needed" and the order was going to be cancelled

5     by a doctor.  AR 20.  At the Board Hearing, plaintiff testified that she drew the blood but did not

6     attach a Fenwal label because she was waiting for the doctor to make a determination as to

7     whether blood-typing would be required, so she put the blood aside in a pink-capped vial aside

8     with a non-Fenwal label.  Because it became clear to plaintiff that the doctor was going to cancel

9     the blood-typing, but because other blood tests were ordered (and presumably the extra vial might

10    be used for those other blood tests), she sent the pink-capped but not Fenwal labeled blood to the

11    lab, and the lab "cancelled" it for failure to comply with Fenwal labeling.  AR 1689-93, 1701-02.

12    Plaintiff claimed that if the doctor had canceled the blood-type order prior to the lab processing the

13    vials, the lab would either not have generated a Fenwal error or the lab would have called to make

14    sure plaintiff intended to cancel the Fenwal order.  AR 1006.

15         However, Nurse Ruiz-Contreras (a Staff Developer who trains and counsels nurses on

16    policy) testified that blood could not be sent to the lab and preserved for potential future tests and

17    that a nurse should not use a pink-capped tube with a label other than a Fenwal label (or the other

18    rare exception not at issue here).  AR 1275-76; 1304-05.  While Nurse Ruiz-Contreras could not

19    say "for sure" that the lab would not accept a pink-capped tube without a Fenwal label, she did say

20    that in that event the lab would call because there would be confusion and the lab would want her

21    to "educate" people on the process. AR 1276.

22         The weight of the evidence supports a finding that plaintiff violated the Fenwal labeling

23    policy.  The evidence demonstrates that the lab, when receiving a pink-capped tub, requires a

24    Fenwal label and that was not done for Patient 2947.  It is not clear that even if the blood-type lab

25    order had been cancelled before plaintiff sent the "extra" vial of blood – which also appears to be

26    against SCVMC policy – that the lab would not have generated an error report.  Plaintiff herself

27    admits that the lab might call because of the confusion as to the purpose of the pink-capped vial

28    without the Fenwal label.

United States District Court
Northern District of California

### C.     Patient 0446

SCVMA policy requires that nurses are required to chart and document their patient care "as soon as possible." AR 26. Nurses are required to assess a patient classified with an acuity Level III within 5 to 30 minutes. AR 58. In light of the complaints about plaintiff's care, Nurse de la Calle began monitoring plaintiff's charting in "real time." Plaintiff was charged with failing to document patient 0446 in a timely manner on March 25, 2009. Patient 0446 arrived by ambulance at 11:21 am with an acuity Level III and plaintiff assessed him at 12:06, but plaintiff failed to document the paramedic report or her assessment until 2:22 pm, and the triage/intake assessment until 5:38 p.m. AR 83-85; 1310. The records indicated that at some point soon after the patient's arrival, plaintiff opened the computer system and generated a default template, but did not actually fill in the assessments until much later. The problem with that, according to Nurse Brollini, is that the template puts in default information creating the wrong impression about a patient's acuity. In this case, despite another nurse charting that patient 0446 had a black pulseless foot, a doctor reviewing the default template would see the default entries of "good pulses," "no swelling," and "no edema" which improperly suggested the patient was stable. AR 1311-1313.

Plaintiff admits she opened the default template to mark the time she was there and after taking the patient's vitals went to see another patient who had just arrived. Plaintiff was then told by the charge nurse to go on her break so that everyone later could attend a staff meeting. AR 1709-1710. At that time, plaintiff also claims to have been out of ratio – with five patients to care (when four is the proper number under a 1-4 acuity ratio) and that she also was taking care of two 1-2 acuity ratio patients. AR 1714-17. Plaintiff asked for help in treating these patients, but the other nurses would not help her. AR 1722; 1727-28. Plaintiff points out that Nurse Brollini admitted that there are situations in which charting is delayed to treat other more acute patients (AR 1310-1311) and that Nurse Brollini did not know the acuity ratios of the other patients plaintiff was treating at that time. AR 1376-77. Plaintiff also testified that the relief nurse, Nurse Cunningham, told her to go on her 30 minute break despite not having charted patient 0446 and another patient.

While plaintiff argues that the weight of evidence does not support the contention that plaintiff unreasonably delayed documenting patient 0446, plaintiff does not specifically address why it took her from 1:00 pm (after she returned from break) until 2:22 pm to chart her assessment, even given her other patients' needs. *See, e.g.,* AR 1716 ("So by the time things settled down and it was really appropriate to do the assessment on this man [] it was 2:22."). While she testified that for one critical patient, she was busy putting him on a monitor and attending while the doctor decided whether to intubate the patient and determine his course of care (AR 1720-22), there is little other evidence or testimony of exactly what she was doing for her other acute patients (administering drugs, running tests, etc.) that would have prevented an earlier charting. The County also pointed out that it was plaintiff who made her own assessments that two of her patients had a 1-2 acuity ratio, and there was no other evidence to support that self-determination. AR 1717-18. And while plaintiff testified she asked a few other nurses for help, and at least one declined, the charge nurse did assist her with one patient. AR 1722, 1727-28.

Finally, while plaintiff relies on Nurse Cervantes' testimony that she was not aware of any nurses who had been disciplined for not timely charting (Motion at 7), Nurse Cervantes acknowledged timely charting is required, and as to whether someone had been disciplined for not timely charting, "I don't think that that is probably something that is very openly shared" between the nurses. AR 1620-21. Finally, there is no evidence that Nurse Cervantes would have known about those issues given her job duties ("I know it's not your job", AR 1621) and no testimony from management or others at SCVMC establish that other nurses had not been disciplined for failure to timely chart.

In sum, the weight of the evidence supports a finding that plaintiff violated policy as to patient 0446 based on the opening of the blank template (with its default information that could be misleading) and failure to input her actual assessments until 2:22 pm (and 5:38 pm on the triage/intake assessment) .

### D.   Patients 1059 and 8187

SCVMC policy requires nurses to verify two patient identifiers (name, medical record, date of birth) when handling blood products. AR 29. On March 25, 2009, plaintiff labeled patient

United States District Court
Northern District of California

1059's blood with patient 8187's labels, and failed to document she drew or sent to the lab

patient's 1059's blood.  AR 253.  At the *Skelly* and Board hearings plaintiff admitted to

mislabeling the blood, but claimed she had not been trained on the new labeling system.  AR 20,

996-97.

Plaintiff admits her error, but argues it isn't something that a suspension could be based on

but something that requires training and remediation.  There is no evidence in the record that other

nurses have not been disciplined for these types of errors.  The weight of the evidence supports the

finding of violation.

### E.      Patient 4626

When a patient is in or is put in restraints federal regulations, a hospital licensing agency,

and hospital policy require that the patient must be evaluated by a physician and a restraint order

placed within 30 minutes (for behavioral reasons) and 60 minutes (for medical reasons).  AR 32-

36.  On March 25, 2009, a patient came in.  It is not clear from the record whether the patient was

in restraints when admitted.  Nurse Cunningham completed the patient's paramedic intake

assessment at 1:05 pm, did not note the presence of restraints, and testified that the presence of

restraints would normally be noted at that time.  AR 96-96; 1157; 1160-61.  Plaintiff first saw the

patient at 1:27 pm and charted a lab draw at 1:32 pm.  Plaintiff claims that the patient was not in

restraints at that time.  AR 1784-85.  At 2:43 pm, plaintiff charted that she adjusted the patient's

restraints.  AR 96, 253.  The 2:43 pm charting entry is the first documentation of restraints.

Plaintiff does not know who applied the restrains (AR 1776), but admits that at 2:43 pm she took

no steps to obtain an order for the restraints.  AR 1776-77.  At 3:00 pm, plaintiff turned over care

to another nurse, without having obtained a restraint order or starting a restraint flow sheet.  AR

254.  Plaintiff testified that she told the new nurse to get the restraint order, but did not document

that fact.  AR 1011.  Nurse Brollini testified that because the patient was in plaintiff's case, no

matter when the restraints were placed and by whom, it was plaintiff's responsibility to get a

restraint order.  AR 1323.

While there is a dispute as to when and how the restraints were placed, there is no dispute

that the patient was in plaintiff's care during the time in which restraints came to her notice and

that she did not take steps to get the order. Instead, she instructed the nurse taking over from her 17 minutes after the charting the presence of the restraints to get the order. The weight of the evidence supports a finding that plaintiff violated policy as to patient 4626.

**F.    Patient 0735**

SCVMC policy requires that medication be maintained in locked secured areas. AR 40. On April 10, 2009, plaintiff left a syringe of Amiodarone in a clear plastic bag at the nursing station, which is in a public area. AR 254. Nurse Brollini testified that there are two proper locations where medication and syringes are kept, in the Pyxis machine and in the crash cart. AR 1328. Plaintiff admits leaving the syringe at the nurse's station, but testified that she could not comply with policy because the medication needed to be immediately available (and therefore, she withdrew it from the Pyxis machine) and stored it at the nurse station, after notifying the Nurse Flamini what it was and why it was there. AR 1031-32; 1827. Plaintiff told Nurse Flamini that if it was needed, they could either call her or administer it themselves. 1032; 1827. Plaintiff testified that she considered but decided against putting the medication in the crash cart in the patient's room because it would be unsafe to retrieve when the patient was thrashing about. AR 1823. Plaintiff also testified that at this time she was out of ratio and busy with other patients. AR 1031; 1826. In support of plaintiff's position, plaintiff presented photographs showing that syringes were routinely kept on a publicly accessible table along a public corridor. AR 1418; 1421-23. SCVMC claims (and plaintiff does not dispute) that the photographs show only unused and empty syringes, which are different from a syringe with medication. AR 830-34; AR 1422.

The parties dispute whether plaintiff's position that using the crash cart was not an option for safety reasons was substantiated or reasonable. Nurse Brollini testified that according to the patient notes, he was alert and oriented and there were no indications that using the cart would be unsafe, and that issue of safety was not raised during the departmental investigation. AR 1425-26. At the Board Hearing, plaintiff testified that getting to the crash cart would be unsafe "with a patient who was thrashing about" and that when this patient got agitated and angry, his heart rate would build up "and that's when he would have the arrhythmia" which required the Amiodarone. AR 1823-24. It is not clear, however, that this patient had a history of "thrashing about" or that

1   more generally when faced with thrashing about patients that the crash cart should not be used.

2   For example, although a patient may be thrashing about, someone would still have to get close

3   enough to administer the medicine, and presumably that person could also access medicine in the

4   first place.

5       In sum, the weight of the evidence supports a finding that plaintiff violated policy as to

6   patient 0735.

7       **G.      Patients 8323 and 1120**

8       Plaintiff was charged with failing to timely assess two patients with Level III acuity on

9   April 13, 2009 within 30 minutes.  She accepted care of patient 8323 at 12:53 pm and patient 1120

10  at 12:54 pm, generated computer default templates for both and made basic assessments but did

11  not chart her assessments until 2:07 pm and 2:23 pm respectively.  Plaintiff contends that she was

12  already caring for two more critical patients and was again out of ratio and delayed filling in the

13  templates because that would have required postponing care for two much more critical patients.

14  AR 1015-16; 1828-29; 1831-32.  Plaintiff admits to having been counseled regarding her

15  timeliness of charting in the part, but the specific 30-minute requirement for documenting the

16  assessment that SCVMC claimed she violated had not been mentioned.  SCVMC responds that

17  Plaintiff did not complain about acuity levels during the departmental interview (AR 1332; 1428),

18  and her claim to not know about the 30-minute requirement shows plaintiff's ignorance of

19  important policy, and her continued use of the default templates put patient care at risk.  AR 1331.

20      It appears to the Court that the 30 minute policy at issue is the need to assess the patient

21  and that documenting those assessments should be done "as soon as possible."  AR 26.  SCVMC

22  does not show that plaintiff did not adequately asses these patients in the 30 minute timeframe.

23  The question is whether plaintiff's opening of the default template without filling in the

24  documentation of the assessments or taking over an hour to document those assessments in each

25  case was unreasonable.  While there is evidence that plaintiff had other patients (which in her view

26  were 1-2 acuity ratio) to whom she was tending during the delay, as noted above, testimony

27  establishes the risks created when a default template is opened and accurate information is not

28  immediately entered.  While this issue presents a closer call than the other violations relevant to

United States District Court
Northern District of California

10

the suspension, the Court cannot say that the weight does not support a finding that plaintiff violated policy as to patients 8323 and 1120.

### H.    Patients 4557 and 1059

SCVMC policy requires employees adhere to HIPAA (the Health Insurance Portability and Accountability Act).  AR 43.  During a departmental investigation with Brollini, plaintiff had in her possession two patients' charts that she admitted printing the night before and storing in her locker.  AR 255-56.  In her Writ, plaintiff argues that even if a technical violation, it doesn't warrant suspension.  Writ at 22.  Plaintiff does not address this violation in her reply.

The Court finds that the weight of the evidence supports the Board's finding of a violation as to patients 4557 and 1059.

### I.    Unidentified Patient

SCVMC policy requires that nurses obtain two personal identifiers (name, medical record, or date of birth) before treating a patient.  AR 29.  On May 1, 2009 plaintiff discharged a patient and gave that patient someone else's discharge papers.  AR 257.  Plaintiff acknowledges giving the patient the wrong paperwork, but contends she caught the patient in the lobby seconds later, retrieved the paperwork, and believes that discharged patient did not review the other patient's paperwork.  AR 1018-1019.  Plaintiff argues that this slight mistake does not justify suspension.  Writ at 22.

As above, the Court finds that the weight of the evidence supports the Board's finding of a violation as to the unidentified patient.

### J.    Patient 4665

SCVMC policy prohibits nurses from accepting verbal orders unless it is an emergency, for example when a patient is coding or crashing.  AR 70; 1339.  On May 2, 2009, plaintiff was alleged to have accepted a verbal order from a physician for IV potassium in a non-emergent situation.  AR 254.  Plaintiff claims that it was not an impermissible oral order because the physician signed an order on the nurse's copy of the record.  AR 1020.  SCVMC argues that nurse's orders are not part of the medical record and plaintiff also failed to chart the order.  AR 1020-21.  Plaintiff responds that she could not have violated policy by accepting an "oral order"

United States District Court
Northern District of California

because it was written down, even if in the wrong place.  She also notes that another nurse, Nurse Stueck, acknowledged seeing the IV order on the nurse's copy.  AR 1170-72. However, Nurse Stueck's testimony is that she saw "conflicting" orders – where the official order required oral potassium and the nurses' order required IV potassium.  AR 1171.  Because of the confusion, Nurse Stueck contacted the physician, and he ordered the IV to be stopped.  AR 1173-74.

On this record, it is unclear whether plaintiff violated the "oral" order prohibition, but it is clear that the way the order was written caused confusion and the eventual termination of the IV.  As such, the weight of evidence supports the Board's determination that a violation as to patient 4665 occurred.

### K.     Conclusion

After exercising independent judgment, the Court has found that substantial weight supports the Board's determination that plaintiff committed the alleged violations.  Plaintiff, however, asks the Court to take into account her allegations of retaliation (based on plaintiff's alleged reporting of Nurse Brollini's poor management and unlawful acuity ratios) to explain the context of why plaintiff was being tracked, and presumably, why many of these violations were discovered.

As an initial matter, the Court notes that at least one violation occurred before plaintiff complained to Nurse Brollini about the illegal external IV, and plaintiff had a history of being counseled for various breaches of policy and about her work style.  AR 17-19.  Additionally, while plaintiff claims the retaliation also stems from plaintiff's complaints about Nurse Brollini's approval or acceptance of unlawful acuity ratios, plaintiff does not point to evidence in the Administrative Record demonstrating to whom plaintiff complained about those ratios, when those complaints were made, or the exact nature of the complaints.

More importantly, there is no evidence in the Administrative Record that other nurses were not subject to similar discipline for the same types of violations that plaintiff committed.  That plaintiff may have been tracked does not diminish the fact that she repeatedly breached policies of SCVMC.  Without evidence that other nurses committed the same types of violations but were not disciplined, the Court cannot say that the weight of evidence does not support the Board's

United States District Court
Northern District of California

1   determination that plaintiff's one-week suspension should be upheld. [3]

2   **II. DEMOTION/TERMINATION**

3      **A.      Patient 7084**

4         SCVMC policy requires "stat" medication orders to be administered within ten minutes.

5   AR 352.  Moreover, before administering blood products, nurses must document the patient's

6   vitals and repeat the vitals every ten minutes and at the end of the transfusion of blood products.

7   AR 320.  On November 28, 2009, at 8:36 am plaintiff was assigned patient 7084.  The physician

8   ordered that a Fresh Frozen Plasma (FFP) be administered "stat."  The FFP was available at 9:31

9   am and was started at 10:03 am and ended at 10:38 am.  AR 268-69.  Plaintiff was alleged to have

10  failed to document vital signs at the start of or after the first ten minutes of the transfusion.  *Id.*

11        The parties debate who started the first unit of FFP and whose responsibility it was to take

12  vitals during that transfusion.  *Compare* Writ at 13-14; *with* Oppo. Br. at 15-16.  *Skelly* officer

13  Nurse Kelton concluded that even though another nurse may have started the first unit of FFP, it

14  was plaintiff's responsibility as the assigned nurse to make sure the vitals were taken.  AR 1542.

15  Plaintiff claims that for training in *another* unit, she was told that the nurse hanging the blood was

16  responsible for the vitals.  AR 1841.  However, there is no dispute that plaintiff hung the second

17  unit of FFP and did not take the vitals as required.  Reply Br. at 6.

18        Plaintiff argues her failure to take the vitals was due to her having two other critical

19  patients down the hall and the refusal of Nurse Flamini to provide help.  AR 1840-1841.  Another

20

21  _____

22  [3] Plaintiff has moved to augment the Administrative Record with evidence she claims supports her
    contentions that (i) the Emergency Department Management created a hostile and intimidating
    work environment, (ii) nurses targeted plaintiff for discipline in an attempt to "oust" her, and (iii)

23  plaintiff was assigned more high acuity patients than others.  Motion to Augment, Docket No. 54.
    As discussed below, the Court does not find that augmentation of the record is appropriate under

24  California Code of Civil Procedure section 1094.5(e).  However, even if this evidence were
    considered by this Court, it would not help plaintiff.  For example, the evidence regarding

25  plaintiff's allegation that she was overloaded with high acuity patients – and therefore some of her
    violations are explained and should be excused – is either contested by the County or not

26  substantiated by plaintiff (*e.g.,* not supported by detailed explanations of what she was doing for
    those patients nor any evidence of her charting/medication activity during the times in question).

27  There is no evidence in the motion to augment that would show that at the specific time of the
    violations at issue plaintiff was, in fact, intentionally overloaded with high acuity patients that

28  caused her errors.  Also, regarding the evidence regarding targeting of plaintiff, there is no
    evidence in the record that other nurses have not been disciplined for similar violations.

United States District Court
Northern District of California

1  nurse, Nurse Solis, did help plaintiff, but also testified that she overheard Nurse Flamini instruct a

2  different nurse not to help plaintiff.  AR 1742-46.  No evidence has been cited to the Court

3  showing the condition of the other two patients plaintiff was attending to during the 20 – 30

4  minute time period when plaintiff was supposed to have checked the vitals of patient 7094 that

5  allegedly prevented her from checking those vitals.  Moreover, even though she was allegedly

6  denied help by Nurse Flamini, she did secure help from Nurse Solis.

7      The weight of evidence supports the Board's determination that a violation as to patient

8  7084 occurred.

9      **B.    Patient 9494**

10     SCVMC policy requires that when a psychiatric patient arrives, nurses must assess patients

11 within 30 minutes of intake and, for those in restraints, get a restraint and seclusion order form

12 signed and begin a restraint flow sheet.  AR 335, 338.  On December 12, 2009, plaintiff was

13 allegedly assigned a psychiatric hold patient at 5:46 pm.  Plaintiff was disciplined because she

14 failed to obtain a restraint order within 30 minutes and initiate a restraint flow sheet.  AR 270.

15 Plaintiff claims that it was not her responsibility to obtain the restraint order because the patient

16 was not assigned to her by the charge nurse.  AR 1846.  Plaintiff contends that patient 9494 was

17 not assigned to her until 7:01 pm, right when her shift ended.  AR 1046-47; 1846.  Plaintiff

18 assessed the patient at that time and turned over the patient to the nurse on the next shift, telling

19 her that a restraint order was needed.  AR 1047; 1846-47.  Plaintiff at some point also gave a

20 restraint order form to a doctor, but the doctor did not complete it properly, and it was rejected.

21 AR 1849.  The successor nurse was able to downgrade the restraint and get an order within 24

22 minutes of accepting care.  AR 1049.

23     While the record is unclear as to when plaintiff was "assigned" patient 9494 (although the

24 *Skelly* officer noted an audit showed the patient was under plaintiff's care, AR 274), a restraint

25 order was required within 30 minutes of the patient was in restraints.  Reply at 6 (noting that

26 patient arrived at ED in restraints).  In these circumstances, it apparently was still plaintiff's

27 responsibility to secure the restraint order, whether because the patient was hers, because she did

28 the first assessment at 5:46 even though the patient wasn't assigned to her, or because given the

14

"red" status of the hospital she knew no one else had been assigned primary responsibility for the patient. AR 1359-60. Moreover, the doctor order that she obtained – which was written at 6:59 (before plaintiff contends she was assigned the patient and before she wrote down her assessments at 7:01)--was admittedly defective. AR 274; 1358.

The weight of evidence supports the Board's determination that a violation as to patient 9494 occurred.

### C.     Patient 6761

The nature of the exact accusation against plaintiff is ambiguous. At the *Skelly* hearing it appears that plaintiff was accused of failing to properly determine that patient 6761 was allergic to a medicine before administering it. The discussion at the *Skelly* hearing appeared to center on plaintiff's claim that she asked whether the patient was allergic to a drug (Reglan) prior to administering it, and the patient claiming to have told plaintiff that she was allergic to Reglan before it was administered. AR 270-74. The County claims that plaintiff was disciplined because of improperly documenting the patient's Reglan allergy, not because of the varying accounts between plaintiff and the patient. Oppo. Br. at 18. Specifically, the discipline was based on plaintiff's documenting the Reglan allergy on the medical record after the patient had left the ED when, as plaintiff contends, the patient did not report it and plaintiff did not observe an allergic reaction. Oppo. Br. at 17-18; AR 1052-53.

It appears the Court that the *Skelly* officer's finding of a violation was based on her concern that plaintiff was not being truthful about when and how she learned of the Reglan allergy, but not because plaintiff annotated the medical record after the drug had been administered and the patient left. *See* AR at 274, 287, 290. The testimony at the Board Hearing is consistent. AR 1553-55 (discussing how it was "odd" that plaintiff learned about the allergy after the patient had left).

It does not appear that plaintiff was disciplined for improperly annotating a chart as to the allergy after the patient left, but instead in light of staff and the hearing officer's concerns about plaintiff's truthfulness and credibility. While that point is not argued in opposition by the County, it was a significant basis for the *Skelly* officer's conclusions upholding discipline. AR 289 ("I am

15

concerned about your inability to take responsibility for your practice") and was raised in the

Board Hearing.  AR 1553-54.  As such, the Court finds that the weight of evidence supports the

Board's determination that a violation as to patient 6761 occurred.

### D.      Patient 9098

The standard of care when administering nitroglycerine is to check a patient's blood

pressure, assess pain, and establish an IV before administration.  AR 1568-70; 1879-81.  On

December 16, 2009, plaintiff allegedly administered nitroglycerine to a patient she knew well

without establishing an IV, without taking his blood pressure until the third dose of nitroglycerine,

and without documenting a pain assessment.  Plaintiff contended that she took the patient's blood

pressure 20 minutes before administering the first dose and did not try to take his blood pressure

again because the patient would often refuse and leave the hospital, and given his history there

was little concern about his blood pressure.  AR 1868; 1874-77. Plaintiff also contended that the

patient would commonly pull out an IV if administered and leave against medical advice.  AR

1868-71.

Plaintiff argues that she did not violate policy because checking blood pressure and starting

the IV were "nursing judgments," and she in her judgment she determined that the patient, given

his history and risk of leaving prematurely, did not need the IV and blood pressure checks prior to

and during administration of the nitroglycerin.  AR 1573; 1866-68; 1875.   However, Nurse

Brollini explained that the IV and blood pressure checks (along with the pain assessments, which

plaintiff took but were not documented) were "basic nursing practices" that were required to guard

against complacency and plaintiff's departure from those practices was not reasonable.  AR 1879-

1882.

The Court finds that the weight of evidence supports the Board's determination that a

violation as to patient 9098 occurred.

### E.      Patient 0760

On January 8, 2010, plaintiff did not administer medicines that had been ordered "stat"

(and are required to be provided within 10 minutes) for almost two hours and did not chart her

notes for nearly two hours.  When Nurse Ferris assumed care over the patient at 3:00 pm, the nurse

United States District Court
Northern District of California

was concerned about the patient's status, saw that there were orders for medication, and had to track plaintiff down in the break room in order to confirm that three of the stat medications had not yet been administered.  AR 1067-91; AR 288.

Plaintiff admits to failing to provide the medications, but explains that those failures were due to the particularly heavy workload (plaintiff had three ICU patients at that time).  AR 1893, 1896, 1915.  Plaintiff asked the charge nurse for help, but only received help from a cover nurse who left after 30 minutes.  AR 1894-97.  The County relies on the testimony of Nurse de la Calle who believes plaintiff received help when she needed it because seven different nurses "documented" on the patients under plaintiff's care during this time, and a review of the Pyxis medication dispensing machine and her charting did not indicate that plaintiff was unusually busy.  AR 277; 1900-03.   Nurse Ferris also testified that plaintiff was not "out of ratio" when she took over and that plaintiff's failure to chart for two hours was highly unusual.  AR 1083, 1086-88.  *Skelly* hearing officer Kelton acknowledged that the ED can be an overwhelming place to work, but that ED nurses have to anticipate a high volume of patients with high acuity.  AR 1565-56.

The Court finds that the weight of evidence supports the Board's determination that a violation as to patient 0760 occurred.

### F.    Patient 1564

SCVMC policy requires that a nurse who receives a critical lab value must immediately notify the physician who has clinical responsibility for the patient.  AR 323.  On January 8, 2010, plaintiff is accused of having received critical lab values at 12:21 pm and 12:28 pm and communicated those to the emergency room physician instead of the ICU physician, even though the patient had been transferred from ED to ICU at either 12:30 or 12:45 pm.  AR 272, 1624. [4]  The record is unclear as to when plaintiff actually transmitted the lab values to a doctor, and there is varying information as to when plaintiff received the results from the lab.  *See* Writ at 17; 1638-39.  The record is also unclear as to when the patient left the ED for the ICU, in part because plaintiff failed to document when that happened.  AR 1641.  However, the discipline charge at

---

[4]  Plaintiff contends that a document secured after the Board Hearings shows that the patient was received in the ICU at 12:45pm.  Reply Br. at 9.

issue was for notifying the wrong doctor of the critical lab values.

The Court cannot find sufficient evidence in the record to uphold the Board's determination of a violation.

### G.    Conclusion

The Court first notes that as to the violations that formed the basis of the transfer and demotion discipline, plaintiff does not submit evidence of retaliation by Nurse Brollini.[5]  Instead, plaintiff primarily challenges whether the violations occurred at all or admits violations but explains them as a result of her high workload.   As discussed above, the Court finds all of the findings of violations, save one, to be adequately supported by the evidence.

Moreover, the seriousness of those violations, as explained in the *Skelly* officer's determination and the testimony at the Board, is significant.  As such, the Court finds that the weight of the evidence supports the Board's determination that transfer and demotion were appropriate.  The Court notes that the Board member who cast the dissenting vote on demoting plaintiff did not dispute that sufficient evidence demonstrated the existence of the violations but felt some of the violations were better remedied through progressive discipline rather than demotion.  AR 1976.

## III.  MOTION TO AUGMENT THE RECORD

As noted above, plaintiff filed a motion to augment the record with additional materials plaintiff contends she did not and could not access to prior to the Board Hearing. The "general rule" is that a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency.  Pomona Valley Hospital Medical Center v. Superior Court, 55 Cal. App. 4th 93, 101 (Cal. App. 1997).  Augmentation of the administrative record is permitted only within the strict limits set forth in section 1094.5, subdivision (e) which provides:

> Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent, it may enter judgment [] remanding the case to be reconsidered in the

---

[5]  Nurse Solis did provide testimony that on one day, she overheard Nurse Flamini tell Nurse Benlice not "to do" plaintiff's work.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   light of that evidence; or, in cases in which the court is authorized
2   by law to exercise its independent judgment on the evidence, the
    court may admit the evidence at the hearing on the writ without
    remanding the case.

3       Unless one of the exceptions noted in section 1094.5(e) applies, "it is error for the court to

4   permit the record to be augmented." *Pomona Valley Hospital Medical Center*, 55 Cal. App. 4th at

5   101. "Determination of the question of whether one of the exceptions applies is within the

6   discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is

7   manifestly abused." *Id*.

8       Plaintiff seeks to introduce a number of pieces of evidence outside the Administrative

9   Record. Docket No. 54. The County opposes that attempt, arguing that petitioner did not

10  demonstrate diligence in seeking the information and that the substance of the information she

11  seeks to add could have been secured prior to the Board proceedings. Docket No. 56.

12      Plaintiff seeks to introduce Exhibit A, a letter plaintiff's counsel wrote requesting that the

13  Board allow briefing and hearing on a motion to compel. Plaintiff clarifies that this letter is

14  included in the motion to show plaintiff's diligence in seeking the other documents and

15  information she seeks to augment the record with. *See* Reply Br. in Support Motion to Augment

16  at 5.

17      Exhibits B through F are submitted in support of plaintiff's argument that she was targeted

18  for discipline by Nurse Brollini as well as her characterization of the ED as a very hostile work

19  environment. Exhibit B is the declaration of Gertrude Johnson, SCVMC's chief nursing officer.

20  Exhibit C is a report that Alice Bess prepared in late 2009 or early 2010 at the request of Gertrude

21  Johnson in response to plaintiff's complaints of "retaliation for reporting problems with the care

22  rendered by others in the ED." Plaintiff seeks to rely on testimony in the Bess report from various

23  staff to support her argument that Brollini and others in the ED were retaliating against plaintiff

24  (by giving her difficult assignments) and targeting her for discipline. Exhibit D is a Mach 26, 2009

25  email from a union representative to Johnson, requesting an investigation of plaintiff's retaliation

26  complaints. Exhibit E is a March 26, 2009, exchange of emails between Johnson and Nurse

27  Brollini regarding plaintiff. Exhibit F is a February 18, 2011 letter from unsigned ED staff to

28  Johnson, Brollini and the union expressing staff members' feelings of intimidation by and the

unreasonable nature of the ED nursing management.  Plaintiff argues that despite her diligence and request for documents prior to and during the Board proceedings, these documents were not released until discovery commenced in this action.

The Court notes that these allegations – that Nurse Brollini and others in ED were targeting plaintiff for discipline, that plaintiff and others had complained about the management style of the ED managers – were raised in both the *Skelly* hearings and in the Board Hearings.  Plaintiff was interviewed by Bess about her allegations in October 2009, and knew that an investigation was ongoing.  *See* Motion to Augment, Ex. C at 3.  Plaintiff also had the opportunity during the Board proceedings to call witnesses to establish her theory that she was being unfairly targeted for discipline or intentionally overloaded.   However, as discussed above, plaintiff has failed to demonstrate based on evidence in the Administrative Record that she was "unfairly" targeted for discipline or intentionally overloaded.  Plaintiff has also failed to demonstrate that other nurses who committed similar violations were not disciplined, or not disciplined as severely.

The evidence with which plaintiff seeks to augment the record does not help her on those points.  Accordingly, the relevance of Exhibits B-F is minimal.  Because plaintiff has not shown that she was not able to adequately develop her retaliation-based defenses during the Board proceedings, or that the information contained in Exhibits B-F materially advances her theory on those defenses or disclosed witnesses she was unable to discover prior to those proceedings, the Court finds augmentation under section 1094.5(e) is not appropriate and DENIES the motion to augment as to Exhibits B – F.

Exhibit G is a declaration by a former SCVMC employee explaining that a page from an ICU log book shows that patient 1565 arrived at the ICU at 12:45 (relevant to one of the violations discussed below).  The Court GRANTS the motion to augment as to Exhibit G.

Exhibit H includes excerpts from the March 21, 2013 deposition of Nurse Solis.  Plaintiff argues these excepts are relevant and should be allowed in the record because while Nurse Solis testified at the Board hearings, plaintiff's counsel did not know about the Bess report and therefore could not question Solis about her attempts to be interviewed for the Bess report.  Solis testified in her deposition that she was willing to be interviewed, but was told that the Bess investigation was

United States District Court
Northern District of California

closed.  Motion to Augment at 7-8.  The Bess report states that Solis declined to be interviewed.  The fact remains that Solis did testify at the hearings and any and all evidence she might have had about retaliation could have been elicited there.  The Court DENIES the motion to augment as to Exhibit H.

Exhibit I is a November 2012 declaration of Fe Zenaida Bowie.  Plaintiff notes that Bowie was called as a witness during the Board hearings, but claims that Bowie was "unwilling to make the statements in this declaration while still working under Nurse Manager Brollini" and would only do so after she retired.  Reply on Motion to Augment at 6.  However, the Bowie declaration does not say she was afraid to testify fully during the Board hearing; that is what plaintiff's counsel surmises.  Declaration of Blaine Fields, ¶ 7.  The Court does not find that Ms. Bowie's testimony in the declaration was unavailable prior to the Board Hearings and DENIES the motion to augment as to Exhibit I.

Exhibit J is a sheriff's report on a June 28, 2009, incident where plaintiff claimed that someone at SCVMC had unhooked her Jeep's hood which then opened upward on her way home and could have caused an accident.  Plaintiff's counsel argues that plaintiff did not recognize the significance of this document – which plaintiff obliquely contends is evidence of the hostile work environment at SCVMC – until recently.  The Court DENIES the motion to augment as to Exhibit J.  Plaintiff's failure to recognize the potential significance of this report does not place the document within the narrow exceptions recognized in Section 1094.5(e) for augmentation of the record.

United States District Court
Northern District of California

**CONCLUSION**

The Petition for a Writ of Administrative Mandamus is DENIED.  The decisions of the Personnel Board were supported by the weight of the evidence.

**IT IS SO ORDERED**.

Dated: September 24, 2013



_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

22